Mr. Justice Clayton
delivered the opinion of the court.
This was a bill filed in the superior court of chancery, by the *327 appellant, alleging that in the month of November, 1836, he purchased of the appellee a large quantity of land and a number of slaves, for the sum of $36,000. The bill farther states that the contract was entire, though the land was estimated at the price of $18,000, the slaves at $17,000, and some other personalty at $1000. It also states that $9000 were paid at the time, and a deed of trust given upon the property to secure the payment of the remaining $27,000. States further that all of said purchase-money has been paid except some $9000, to coerce which the trustees are 'about to proceed under the trust deed.
It charges that five of the slaves were introduced into this state by said Evans in 1836, as merchandise, and sold in direct violation of the constitution of this state. It therefore prays for ah injunction to restrain the sale, and for a rescission of the contract upon the ground of a violation of the law. The bill offers to return and reconvey all the property, and prays that the money paid may be refunded. The bill was filed and injunction granted on the 29th of March, 1842.
The answer positively denies that any of the slaves were introduced into this state as merchandise, in violation of the constitution. The defendant states that he became a citizen of Mississippi in 1831, and has been a slave-holder and corn and cotton-planter from that time. Answer also states, that in the summer or fall of 1836, he brought five of said slaves from Tennessee for his own use, and put them with his other negroes on his plantation, and worked them in his crop, until he sold them with the plantation and ten other slaves to said Hope.
Several depositions were taken. The Chancellor upon motion dissolved the injunction, from which order an appeal was taken to this court.
It will be necessary to examine the testimony with some degree of minuteness. Samuel H. Galloway proves that in the early part of October, 1836, Evans proposed to sell to him the same plantation and negroes, which were afterwards sold to Hope. That about the 10th of the same month, Evans first offered them with the plantation for sale to Hope, and that they were put *328 on the tract of land for the purpose of selling them together with the land. He states that six or eight of the slaves were brought into the state by Evans for sale, that they were to be put on the land for the purpose of enhancing its value, and sold with the plantation. This he learned from Evans himself; and on cross-examination he states that the said slaves were brought into the state by Evans for his own use, and to sell with the land.
James W. Cusack states that in the spring of 1836, Evans informed him, that he had purchased of one Edwards a plantation, the same which was afterwards sold’ to Hope; that he had also purchased of Edwards a portion of the hands, that he would visit the state of Tennessee during the ensuing summer, and would purchase some additional 'negroes, bring them to this state and place them on the plantation, when he thought he would be able to sell the plantation and negroes at a'' profit. That Evans said that when he purchased the property of Edwards he thought he could make a speculation out of it by supplying the additional hands that were wanting, and then selling it at an advance. Evans returned from Tennessee about the 1st of October, 1836, placed the negroes he brought with him upon the plantation with his other hands, and treated them all alike. Also stated that Evans had resided in this state since the spring of 1831. A. Bridges proved that in the fall of 1836, Evans offered to sell to the witness the plantation and negroes afterwards sold to Hope.
Edward D. Edwards proves that he sold the plantation to Evans in the spring of 1836, together with a portion of his negroes. He gave possession in October, 1836, to Evans, who then put the negroes which he brought from Tennessee upon the place. After he took possession he applied to witness to release him from the contract, which he refused to do. His reason for wishing to be released, was, that he had not hands enough to work it properly, and witness, as an inducement to ‘him to abide by the trade, sold him six more hands. While Evans was in Tennessee, he wrote to witness that he would get some one to take an interest in the place, and live on it and carry on the business. After his return he told witness that he *329 had seen a place on the Tallahatchie river, which he wished to buy, or had already bought, which suited him better than this place, and that he wished witness to let him off the contract. Witness refused, and in a few weeks he commenced a trade with Hope. Witness stated that he had known Evans from his infancy, and that he had never been a negro trader. After he had sold the place to Hope, and finished gathering his crop, Evans moved up to the place he had bought on Tallahatchie river, where he had resided ever since. This is in substance all the testimony.
This contract was made before the enactment of the statute against the introduction of slaves into this state for sale; it must consequently be governed by the prohibition of the constitution alone. The clause of the constitution is as follows: “ The introduction of slaves into this state as merchandise or for sale, shall be prohibited from and after the 1st day of May, 1833: Provided, that the actual settler or settlers shall not be prohibited from purchasing slaves in any state in this Union, and bringing them into this state for their own individual use, until the year 1845.” This provision in itself amounted to a prohibition, without any legislative enactment, as this court has heretofore dicided. 5 How. 102; 7 Ibid. 15.
The object of this provision was to put down the trafile in slaves which had been previously carried on, and to prevent their introduction as merchandise. It was. not the object to prohibit actual settlers from purchasing slaves in other slave-holding states, and bringing them here for their own use, prior to the year 1845. The settler would not be permitted to evade the law, by entering into this kind of trafile, and making his residence a mere mantle to cover the illegality of the transaction. If he bring slaves into the state purchased abroad with the intention of selling them, and carry that intention into effect by sale, unquestionably he violates the law; but if he bring them with the bona fide intention to apply them to his own use, and afterwards change his intention and sell them, it does not, in our opinion amount to an infraction of the law.
Viewing the testimony in this light, we do not think the com *330 plainant has made out his case. These five slaves were included in a large sale of- other property. The evidence shows that the defendant had purchased land upon which he did not wish to reside, in consequence of a change in his plans after his purchase. He sometimes spoke of placing more slaves on it, in order to sell it; at other times of getting some one to live on it, and manage it in partnership, and he made efforts to get released from the contract. It does not appear that he offered it for sale, until he had made the effort to rescind and had failed. The proof shows that he was a planter, and man of property, and that he had never been engaged in that species of traffic intended to be prohibited. The answer flatly denies the intention attributed to him. It is not fair to presume, from the proof, that these slaves were introduced as merchandise or for sale, since there is no evidence that they were ever offered, except in connection with a large tract of land and other property. It would extend the provision beyond its legitimate scope, to hold that a settler, who had bought slaves in another state,and brought them into this for his own use, could not afterwards sell them together with the rest of his estate, without a violation of the law. The intention must govern in all such instances, and the intention must be inferred from all the circumstances. And whilst we guard the law from infraction, we must be careful not to deprive the citizen of rights which are secured to him.. We do not think that the intention to violate orto evade the law, is so made to appear by the testimony in this case, as to warrant a decree in favor of the complainant.
The broad language in 5 How. 102, would point to a different result. But in that case the person who sold the slaves was not a resident of this state, and the answer admitted that the slaves were introduced for sale. The point in this cause was not then involved. The court there said, “ the great object which the convention had in view was to suppress the slave trade in this state. They deemed that the time had arrived when-the traffic in this species of property ‘ as merchandise ’ should cease.”— “The act of introduction may in some cases be lawful; it will always be illegal, however, if the intent is to sell. The sale *331 consequent upon the introduction, evidences the intent, and fulfils the illegal purpose.” In all this we concur, except in the remark that the sale is conclusive evidence of' the intention. In a case like the present, we think that the intention must be judged of, from all the circumstances taken in connection, “that the act does hot make guilt, unless the intention were guilty,” and that the intention must be gathered - from the whole proof in the cause.
Our view of the testimony makes it unnecessary to pass upon the legal questions which were discussed.
The decree of the Chancellor, dissolving the injunction, will be affirmed.